# 05-40042

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

FILED
_____ OFFICE

___ FEB 27  P 1: 34

U.S. DISTRICT COURT
DISTRICT OF MASS.

COY PHELPS

PETITIONER

- v -

DAVID WINN, et. al.

RESPONDENT(S)

CASE No:

PETITION FOR A WRIT OF HABEAS CORPUS

AND  A

PETITION  FOR A JUDICIAL REVIEW OF
ADMINISTRATIVE  DECISIONS

---

## I

### JURISDICTION AND AUTHORITY

THIS COURT HAS JURISDICTION AND AUTHORITY TO REVIEW THIS PETITION AND TO GRANT RELIEF AND REMEDY UNDER 28 USC 2201-2202 (DECLARATORY JUDGMENT), 28 USC 2241 (HABEAS CORPUS), AND 5 USC 701-706 (JUDICIAL REVIEW OF ADMINISTRATIVE DECISIONS). THIS COURT HAS EQUITY JURISDICTION ALSO.

## II

### EXHAUSTION OF ADMINISTRATIVE REMEDY

ALTHOUGH THE TERMS OF THE PRISONER LITIGATION REFORM ACT (REQUIRING EXHAUSTION OF REMEDY) DOES NOT APPLY TO THE ABOVE PETITIONER (PHELPS) BECAUSE OF THE LEGAL STATUS OF BEING A UNCONVICTED CIVIL COMMITMENT, HE HAS EXHAUSTED HIS REMEDIES REGARDING A CHALLENGE TO ALL THE RULES, REGULATIONS, POLICIES, AND STATEMENTS OF THE BUREAU OF PRISONS (BOP)(FILE NUMBER 267518), AND REGARDING A CHALLENGE TO ALL THE ACTS, ACTIONS, INACTIONS, AND OMISSIONS OF BOP EMPLOYEES (FILE NUMBER 281333).



## STATEMENT OF THE ISSUES

THE PETITIONER (PHELPS) REQUEST DECLARATORY JUDGMENT AS FOLLOWS:

STATUTORY ANALYSIS:

1. THE COURT MUST GIVE FULL WEIGHT AND MEANING TO EVERY WORD AND PHRASE

# III

## STATEMENT OF THE ISSUES

THE PETITIONER (PHELPS) REQUEST DECLARATORY JUDGMENT AS FOLLOWS:

### STATUTORY ANALYSIS:

1. THE COURT MUST GIVE FULL WEIGHT AND MEANING TO EVERY WORD AND PHRASE OF THE FEDERAL MENTAL HEALTH LAWS BUT MUST REMAIN WITHIN THE SCHEME OF THE STATUTE AND THE INTENT OF THE LAW MAKERS

   (a) THE INTENT OF THE LAWMAKERS WAS TO GIVE ABSOLUTION AND FORGIVENESS TO THE INSANITY ACQUITTEE FOR CRIMINAL WRONGDOING TO INSURE THAT HE WOULD NOT BE PUNISHED OR SUFFER INCARCERATION BUT WOULD BE "HOSPITALIZED" IN A TYPICALLY COMMON CIVIL "HOSPITAL" AS A "PATIENT" FOR CARE AND TREATMENT IN A REHABILITATION PROGRAM THAT GIVES A MENTAL PATIENT A REALISTIC OPPORTUNITY TO HEAL AND RECOVER TO BE RELEASED BACK INTO THE COMMUNITY AS A PRODUCTIVE MEMBER OF SOCIETY

   (b) THE INSANITY ACQUITTEE CANNOT SUFFER INCARCERATION OR IMPRISONMENT IN A JAIL, PRISON, PENITENTIARY, CORRECTIONAL INSTITUTION, OR ANY OTHER FACILITY THAT IS MANAGED AND OPERATED AS A PENAL INSTITUTION

   (c) THE INSANITY ACQUITTEE CANNOT BE CONFINED IN A PENAL ATMOSPHERE OR ENVIRONMENT OR BE SUBJECTED TO THE SAME CONDITIONS, RULES, OR REGULATIONS OF A CONVICTED PRISONER OR PRE-TRIAL DETAINEE

   (d) THE INTENT OF THE LAWMAKERS IN ENACTING 18 USC 4243 AND 18 USC 4247 (INSANITY ACQUITTEE STATUTES) IS TO GIVE THE U.S. ATTORNEY GENERAL AND THE U.S. DISTRICT COURT JURISDICTION AND AUTHORITY OVER THE

INSANITY ACQUITTEE BUT ONLY UNTIL A STATE WILL ASSUME RESPONSIBILITY FOR THE ACQUITTEE MAKING THE ACQUITTEE SUBJECT TO STATE LAWS, AND WHEN THE STATE ASSUMES RESPONSIBILITY "PURSUANT TO STATE LAWS", THE U.S ATTORNEY GENERAL PERMANENTLY SURRENDERS ITS JURISDICTION AND AUTHORITY TO THE STATE ATTORNEY GENERAL AND THE U.S DISTRICT COURT PERMANENTLY SURRENDERS ALL JURISDICTION AND AUTHORITY TO THE STATE COURTS

   (i) THERE IS NOTHING IN THE STATUTORY PROVISIONS THAT PROHIBITS ANY STATE FROM ASSUMING RESPONSIBILITY

      (A) PHELPS WAS COMMITTED IN CALIFORNIA BUT THE STATUTE DOES NOT PROHIBIT HIM FROM BEING RELEASED TO ANOTHER STATE

(E) 18 USC 4247(i) REQUIRES THE SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS) TO IMPLEMENT THE PROVISIONS OF THE FEDERAL MENTAL HEALTH LAWS — NOT THE DIRECTOR OF THE U.S, BUREAU OF PRISONS (B.O.P.)

(F) 18 USC 4247(j) REQUIRES THE SECRETARY OF THE DHHS TO APPROVE AND TO CERTIFY THE "HOSPITAL" AND THE REHABILITATION PROGRAM AS BEING PROPER, ADEQUATE, AND APPROPRIATE WHICH WILL ASSURE INDIVIDUALIZED CARE AND TREATMENT IN THE LEAST RESTRICTIVE FUNCTIONING SETTING FOR THE ACQUITTEE SPECIFIC TO THE ACQUITTEES OWN NATURE AND CHARACTERISTICS

(g) 18 USC 4243(f) GIVES THE TREATING DOCTORS AT THE HOSPITAL (IN WHICH THE ACQUITTEE IS CONFINED) THE SOLE AUTHORITY AND RESPONSIBILITY TO FORMULATE RELEASE CONDITIONS

   (i) THE COURT CAN ONLY APPROVE (OR DISAPPROVE) THE CONDITIONS TO DETERMINE IF THE CONDITIONS ARE LAWFUL AND CONSTITUTIONAL. IT HAS NO AUTHORITY TO FORMULATE OR IMPOSE ITS OWN CONDITIONS

(h) PURSUANT TO 18 USC 4243(f) THE TREATING DOCTORS MUST NOTIFY THE COURT "PROMPTLY" WHEN THE ACQUITTEE HAS RECOVERED

    (i) THE DOCTORS (DIRECTOR) CANNOT DELAY AND WAIT UNTIL THE ANNUAL REPORT TO THE COURT IS DUE

(i) UNDER 18 USC 4243(e) AND (f) THE DIRECTOR MUST MAKE "ALL" REASONABLE EFFORTS (NOT JUST A ANNUAL EFFORT, OR SOME EFFORTS) TO CAUSE THE STATE (ANY STATE — NOT JUST THE COMMITTING STATE) TO ACCEPT RESPONSIBILITY OF THE INSANITY ACQUITTEE

(j) UNDER 18 USC 4243(g) THE ONLY REASON A RELEASED INSANITY ACQUITTEE CAN BE ARRESTED (OR NOTIFIED) IS FOR FAILING TO COMPLY WITH ONE OR MORE OF THE RELEASE CONDITIONS;

    (i) MERE ALLEGATIONS THAT THE ACQUITTEE NEEDS FURTHER TREATMENT WILL NOT JUSTIFY AN ARREST OR REVOCATION OF RELEASE

2. THE RULE OF LENITY APPLIES TO CIVIL PATIENTS AS EQUALLY TO CONVICTED PRISONERS

3. THERE ARE NO PROVISIONS IN 18 USC 4243 OR 18 USC 4247 THAT AUTHORIZED, OR ALLOWS, FOR FEDERAL CONFINEMENT OF A INSANITY ACQUITTEE

    (A) 18 USC 4243(e) GIVES THE U.S. ATTORNEY GENERAL ONLY THREE OPTIONS

        1. RELEASE TO THE COMMUNITY UNCONDITIONALLY, OR

        2. RELEASE TO AN APPROPRIATE STATE OFFICIAL, OR

        3. CONFINE THE ACQUITTEE TO A PSYCHIATRIC HOSPITAL

            (A) IF THE ATTORNEY GENERAL CHOOSES TO HOSPITALIZE, HE HAS ONLY 4 OPTIONS

                1. PETITION A STATE COURT FOR A STATE CIVIL COMMITMENT UNDER STATE LAW, OR

                2. CONTRACT WITH A STATE (ANY STATE) OR POLITICAL SUBDIVISION, OR

                3. CONTRACT WITH A LOCALITY, OR

                4. CONTRACT WITH A PRIVATE AGENCY

THERE ARE NO PROVISIONS FOR FEDERAL CONFINEMENT - NOT IN THE U.S. BUREAU OF PRISON ESPECIALLY;

    (A) EVEN IF THE GOVERNMENT CONSTRUCTED A CONCRETE AND IRON BUILDING AND ERECTED A SIGN AT THE ENTRANCE READING "CIVIL HOSPITAL", IT STILL COULD NOT CONFINE PERSONS IN IT — BECAUSE THERE ARE SIMPLY NO PROVISIONS FOR FEDERAL CONFINEMENT;

4. 18 USC 4042 AND 28 CFR 0.95 - 0.96 GIVES THE U.S. BUREAU OF PRISONS AUTHORITY AND JURISDICTION ONLY OVER PENAL AND CORRECTIONAL INSTITUTIONS (NOT CIVIL HOSPITALS) AND ONLY OVER THOSE CHARGED WITH CRIMES AND THOSE CONVICTED OF CRIMES (NOT UNCONVICTED CIVIL PATIENTS);

5. FOUCHA V LOUISANA, 1974, 504 US 71 WAS CORRECT IN SAYING THE FEDERAL GOVERNMENT DOES NOT HAVE A CIVIL HOSPITAL IN WHICH TO CONFINE INSANITY ACQUITTEES;

6. WILLIAMS V RICHARDSON 8C 1973, 481 F2d 358 IS STILL TRUE IN SAYING "WE HAVE CONTINUOUSLY HELD THAT THE FEDERAL MEDICAL CENTERS ARE PENAL INSTITUTIONS" (NOT HOSPITALS) AND THOSE CONFINED THEREIN SUFFER INCARCERATION (NOT HOSPITALIZATION) CITING HENRY, 440 F2d 1052 AND COY, 439 F2d 400;

7. JONES V US, 1983, 463 US 354 AT 369 AND YOUNGBERG V ROMEO, 1982, 457 US 307 AT 316 AND 321-322 AND U.S. V JAIN, 701999, 174 F3d 892 AT 898 WAS CORRECT IN SAYING PRISON RULES CANNOT BE APPLIED TO INSANITY ACQUITTEES AND INSANITY ACQUITTEES CANNOT BE TREATED AS CONVICTED PRISONERS OR SUFFER THE SAME CONDITIONS, DISCIPLINES, OR PUNISHMENTS AS CONVICTED PRISONERS;

    (A) THE RULES OF THE U.S. BUREAU OF PRISONS WERE ESTABLISHED FOR ONLY CONVICTED PRISONERS AND ARE NOT LAWFULLY APPLICABLE TO CIVIL PATIENTS;

8. All local, state, and federal courts are bound by the most recent U.S. Supreme Court decision on a given issue.

9. 28 CFR 551.101(a)(1) and U.S. Bureau of Prisons Policy Statement 7331.04 (giving the Bureau of Prisons employees to treat unconvicted civil mental patients as convicted criminal prisoners with no mental illness) is unlawful and unconstitutional and is in violation of the scheme and intent of the lawmakers of 18 USC 4243 and is in violation of Jones, Vitanberg, and Williams.

10. A federal regulation and a Bureau of Prisons Rule must be founded upon appropriate statutory authority.
    (A) If the U.S. Bureau of Prisons does not have lawful statutory custody of Phelps, the Bureau of Prisons cannot give itself authority to have custody of Phelps or to treat him as a convicted prisoner.

11. The U.S. Bureau of Prisons (a FEDERAL agency) has never had lawful custody of Phelps.
    (A) When the prison officials at El Reno Oklahoma realized they did not have lawful custody of Phelps they compounded the injury by having him transferred to the Oklahoma City County Jail and such a transfer was unlawful and unconstitutional.
    (B) When a Rule or Regulation is based upon a statute which is later repealed or abrogated, the Rule or Regulation is nullified and cannot be applied to anyone.

12. THE OATH OF OFFICE TAKEN BY EVERY FEDERAL EMPLOYEE TO UPHOLD AND DEFEND THE U.S. CONSTITUTION AND THE LAWS IS PRIMA FACIAE PROOF THAT THEY KNOW THE LAWS AND UNDERSTAND THE LAWS THEY HAVE SWORN TO UPHOLD AND TO DEFEND;

13. UNCONVICTED CIVIL MENTAL PATIENT HAVE MORE RIGHTS THAN PRE-TRIAL DETAINEES, AND PRE-TRIAL DETAINEES HAVE MORE RIGHTS THAN CONVICTED PRISONERS;

14. UNCONVICTED CIVIL MENTAL PATIENTS HAVE, AT THE VERY LEAST, THE SAME RIGHTS AS A CONVICTED PERSON SENTENCED TO HOME CONFINEMENT;

15. ALL GOVERNMENT EMPLOYEES ASSIGNED TO CARE FOR, TREAT, OR TO SUPERVISE A INSANITY ACQUITTEE MUST BE A QUALIFIED PROFESSIONAL WITH KNOWLEDGE, SKILLS, AND EXPERIENCE IN MENTAL HEALTH AND IN THE CARE AND TREATMENT OF THE MENTALLY ILL AND MENTALLY DISABLED;

16. VERBAL ABUSE OF THE MENTALLY ILL IS EQUIVALENT TO A PHYSICAL ASSAULT ON THE PHYSICALLY DISABLED;

17. RULES OF ETHICS AND EMPLOYEE CONDUCT CREATES A LIBERTY INTEREST AND GIVES A UNCONVICTED CIVIL MENTAL PATIENT COMMITTED TO THEIR CUSTODY A PRIVATE CAUSE OF ACTION FOR A VIOLATION OF THESE RULES;

18. 18 USC 4001(a) APPLIES TO CIVIL COMMITMENTS, INSANITY ACQUITTEES, THE MENTALLY ILL, AND THE MENTALLY DISABLED;

19. IT IS UNLAWFUL AND UNCONSTITUTIONAL FOR A UNCONVICTED CIVIL MENTAL PATIENT TO BE CONFINED IN A FACILITY THAT IS MANAGED AND OPERATED AS A PENAL INSTITUTION;

20. UNCONVICTED CIVIL MENTAL PATIENTS MUST HAVE DAILY OPEN UNRESTRICTED ACCESS TO THEIR TREATING PSYCHIATRIST OR PSYCHOLOGIST;

21. THE GREATER DISTANCE IN TIME BETWEEN THE CRIME AND A RELEASE EVALUATION, THE LESS THE CRIME, OR THE NATURE OF THE CRIME, CAN BE USED TO DENY A RELEASE;

22. ANY GOVERNMENT ACTION OF PLACING A UNCONVICTED CIVIL MENTAL PATIENT IN A ATMOSPHERE, ENVIRONMENT, OR CONDITION WHICH CAUSES MENTAL DETERIORATION OR WORSENS ITS CONDITION IS UNLAWFUL AND UNCONSTITUTIONAL;

23. IF THE GOVERNMENT MAINTAINS CONTROL OVER A MENTAL PATIENT AFTER HE HAS RECOVERED, THEN THAT CONTROL IS UNCONSTITUTIONAL AND UNLAWFUL

24. "TREATMENT" FOR THE CONVENIENCE OF THE ADMINISTRATION IS UNCONSTITUTIONAL

25. EVEN THOUGH A UNCONVICTED CIVIL MENTAL PATIENT IS COMMITTED FOR "MEDICAL, PSYCHOLOGICAL, OR PSYCHIATRIC TREATMENT, THE PATIENT STILL HAS THE RIGHT TO REFUSE THE TREATMENT AND CANNOT BE PUNISHED FOR REFUSING WHEN HE IS COMPETENT, RATIONAL, AND COMPLIANT

26. ADMINISTRATIVE DETENTION OR SEGREGATION CANNOT BE USED AS A ROUTINE PRACTICE NOR CAN A UNCONVICTED CIVIL MENTAL PATIENT BE PLACED IN SECLUSION OR SEGREGATION WITHOUT PRIOR APPROVAL OF A PSYCHIATRIST - ABSENT AN EMERGENCY

27. EVEN FEDERAL MENTALLY ILL PATIENTS ARE ENTITLED TO A PROTECTIVE AND ADVISORY PUBLIC ORGANIZATION NOT ASSOCIATED WITH THE GOVERNMENT

28. A GOVERNMENT EMPLOYEE HAS A DUTY TO INTERVENE IN THE ABUSE AND MISTREATMENT OF THE MENTALLY ILL BY ANOTHER GOVERNMENT EMPLOYEE

29. A RULE, REGULATION, OR TREATMENT CANNOT BE IMPOSED UPON A UNCONVICTED CIVIL MENTAL PATIENT THAT IS COUNTER-THERAPEUTIC, AND A ATMOSPHERE, ENVIRONMENT, OR CONDITION THAT IS COUNTER-THERAPEUTIC IS PUNISHMENT REGARDLESS OF THE LABEL

30. THE EMPLOYEES OF A AGENCY MUST OBEY THE RULES PROMULGATED BY THE AGENCY REGULATING THE CONDUCT AND ACTIVITIES OF THE EMPLOYEES

31. IT IS THE DUTY, RESPONSIBILITY, AND OBLIGATION OF SUPERVISING STAFF TO PREVENT MENTAL PATIENT FROM INTERFERING WITH THE HEALING, RECOVERY, REHABILITATION, OR THERAPY PROGRAM OF ANOTHER MENTAL PATIENT

32. IT IS PUNISHMENT TO PLACE A UNCONVICTED CIVIL MENTAL PATIENT IN A PLACE SURROUNDED BY UNWANTED, DISTURBING, OFFENSIVE, AND EXCESSIVE NOISE, SPEECH, OR SOUND WHICH DEPRIVES THE PATIENT OF QUIET, REST, OR SLEEP;

33. FOR UNCONVICTED CIVIL MENTAL PATIENTS, THE GOVERNMENT MUST MAXIMIZE PROTECTING PERSONAL AUTONOMY AND OUTSIDE SOCIAL INTERACTION AND MINIMIZE INTERFERENCE WITH THE PATIENTS MAIL (AND OTHER COMMUNICATIONS) PRIVACY, AND RIGHTS

34. RETALIATION, HARASSMENT, OR VINDICTIVE SPITEFUL ACTION TAKEN AGAINST THE MENTALLY ILL IS IMPERMISSIBLE — BY CUSTODIANS OR BY OTHER PATIENTS;

35. IT IS IMPERMISSIBLE TO PUNISH A VICTIM OF AN ABUSE, BOTH SEGREGATION OR SECLUSION, EVEN ON THE ALTRUISTIC THEORY IT IS FOR HIS OWN SAFETY, SECURITY, OR WELFARE;

36. INCOMING MENTALLY ILL PATIENTS MUST BE EVALUATED FROM A "CLEAN SLATE" APPROACH WHETHER THE EVALUATION IS FOR THE COURT OR FOR INTERNAL CLASSIFICATION, AND ONLY WHEN THE DOCTOR DOUBTS HIS OWN ABILITIES OR NEEDS CONFIRMATION SHOULD THE HISTORY OR RECORD BE UTILIZED;

37. POLYGRAPHS (AND OTHER SUCH MEASURING DEVICES) CANNOT BE USED ON A MENTALLY ILL PATIENT, OR SOMEONE SUFFERING FROM A MENTAL DISEASE, DEFECT, OR DISORDER, BECAUSE THE MACHINE, OR APPARATUS, CANNOT DISTINGUISH FROM A NORMAL RESPONSE OR A RESPONSE THAT HAS BEEN FILTERED THROUGH DELUSIONS OR OTHER FORMS OF MENTAL DISABILITIES;

38. CASE LAW DECISIONS FOR CONVICTED PRISONERS OR PRE-TRIAL DETAINEES CANNOT BE APPLIED TO UNCONVICTED CIVIL MENTAL PATIENTS BECAUSE THE FOCUS OF ONE IS ON "PATIENTS RIGHTS" AND THE OTHER FOCUS IS ON "PRISONERS RIGHTS;"

39. EVEN THE COURTS ABUSE ITS DISCRETION AND EXCEEDS ITS AUTHORITY WHEN IT VIEWS, OR TREATS, A UNCONVICTED CIVIL MENTAL PATIENT BY THE SAME STANDARDS APPLIED TO CONVICTED PRISONERS WHO DO NOT SUFFER FROM A MENTAL ILLNESS, DISABILITY, OR DISORDER;

40. A insanity acquittee cannot have a new trial based upon actual innocence without violating double jeopardy or res judicata, but a insanity acquittee can use the actual innocence claim to obtain a release under subsection (1) of 18 USC 4243;

41. It patently offends the U.S. constitution and the law to set aside a television room especially for mexican-americans, and another television room for african-americans and do not set aside a special television room for white americans;

42. A inmate has a cause of action when the customans allow inmates to make noise at night, by being disruptive and disorderly, that deprives other inmates of sleep and rest;

43. When there is a posted rule requiring silence, no noise, or "quiet time" between 10 pm and 6 am, the customans have a lawful duty to enforce the rule;

44. When a operations lieutenant, or other officer, knows a inmate is a heart attack risk and engages in conduct of verbal abuse, threats, intimidations, and aggressive action to cause the inmate to have a level of stress to cause a heart attack, it is murder or attempted murder and is criminally chargeable;

45. It is unconstitutional to leave a uncontracted civil mental patient in milieu therapy where there are no mental health doctors, nurses, technicians, or workers on the housing unit.

46. When the administration allows a special class of inmate to dominate and control a specific area of the institution (dining room, recreation area, sports area, education area, etc) because of race, color, creed, or national origin, a inmate has a cause of action even though no injury has yet occurred.

47. When a inmate files a lawsuit against the BOP for excessive cellmate noise, and settles out of court for a certain sum of money and an agreement that the BOP will not allow any more television sets, radios, players, and other such entertainment devices (in the institution) that has internal speakers (requiring inmates to use a walkman type radio with ear pieces to hear the sound), and the inmate is transferred to another institution that has noise rules requiring earphone listening, but allowing television sets to be played with internal speakers which is dangerous and annoying and harmful, can the inmate demand full damages from the old case as well as filing another lawsuit for the current injury.

48. Citizen patients and citizen prisoners have more rights than illegal aliens who have become patients or prisoners.

49. Illegal patients and illegal prisoners cannot be confined in the same facilities as citizen patients or citizen prisoners. Nor can illegal patients or prisoners receive the same quality of care and treatment or benefits of citizen patients and citizen prisoners.

50. ALL ILLEGAL ALIENS WHO ARE PATIENTS OR PRISONERS MUST BE CONFINED IN A SEPARATE FACILITY DESIGNATED FOR ILLEGAL ALIENS;

51. THE U. S. ATTORNEY GENERAL OF THE UNITED STATES MUST SUE THE COUNTRY FROM WHICH THE ILLEGAL ALIEN CAME TO REPLACE THE COST OF SEARCHING FOR AND APPREHENDING THE ILLEGAL ALIENS AND TO REPLACE THE COST OF SUPPORT OF THE ILLEGAL ALIEN FOR ALL THE TIME THE ALIEN HAS BEEN IN THE UNITED STATES OR ITS TERRITORIES;

52. THE CLASSIFICATION AND HOUSING ASSIGNMENT OF UNCONVICTED CIVIL MENTAL PATIENTS MUST BE MADE UPON A INDIVIDUALIZED ASSESSMENT AND EVALUATION BY A PSYCHIATRIST OR PSYCHOLOGIST BASED UPON HIS OWN PROFESSIONAL JUDGMENT — NOT UPON THE RECORD OR FOR THE CONVENIENCE OF THE ADMINISTRATION;

53. THE RIGHTS ENUMERATED IN 41 USC 10841 ARE APPLICABLE TO BOTH FEDERAL AND STATE CIVIL MENTAL PATIENTS;

54. EVERY CITIZEN OF THE UNITED STATES, AND EVERY TOWN, CITY, COUNTY, MUNICIPALITY, STATE, OR COMMONWEALTH HAS STANDING TO SUE MEXICO UPON SHOWING A DEPRIVATION OF RIGHT, BENEFIT, OR RESOURCE DUE TO THE INFLUX OF ILLEGAL ALIENS FROM MEXICO;

55. WHEN A GOVERNMENT AGENCY DOES NOT HAVE LAWFUL CUSTODY OF A PERSON, IT IS LIABLE FOR DAMAGES FOR ALL ACTS, ACTIONS, INACTIONS, AND OMISSIONS OF ITS EMPLOYEES THAT HAS CAUSED HARM, INJURY, ANGUISH, DISTRESS, PAIN AND SUFFERING TO THAT PERSON;

56. OUTGOING MAIL FOR UNCONVICTED CIVIL MENTAL PATIENTS MAY BE MAILED OUT SEALED, AND UNINSPECTED.

57. OUTGOING TELEPHONE CALLS FOR UNCOMMITTED CIVIL MENTAL PATIENTS CANNOT BE SCREENED, RESTRICTED, MONITORED, OR RECORDED;

58. OUTGOING TELEPHONE CALLS MADE TO ATTORNEYS, OR TO THE LEGAL PROFESSION, CANNOT BE MONITORED OR RECORDED.

59. UNCOMMITTED CIVIL COMMITMENTS ARE ENTITLED TO ABSOLUTE PRIVACY IN THEIR MAIL AND TELEPHONE COMMUNICATIONS.

# IV

## BACKGROUND

1985 - PHELPS WAS ARRESTED ON CHARGES OF BOMBING JEW SYNAGOGUES, JEW HOMES, AND OTHER
BUILDINGS. HE CLAIMED HE WAS INNOCENT AND THAT HE WAS BEING FRAMED BY A INTERNATIONAL
JEW CONSPIRACY. EVERYONE BELIEVED HE WAS DELUSIONALLY INSANE BECAUSE OF THE CLAIM
OF A JEW CONSPIRACY. A JURY FOUND HIM INSANE AND HE WAS COMMITTED TO THE CUSTODY
OF THE U.S. ATTORNEY GENERAL UNDER 18 USC 4241 AND 4243 (FEDERAL INSANITY LAWS)
WHO PLACED PHELPS INTO THE CUSTODY OF THE DIRECTOR OF THE U.S. BUREAU OF PRISONS WHO
"INCARCERATED" AND "IMPRISONED" PHELPS IN VARIOUS FEDERAL PRISONS (AS IF HE HAD
BEEN FOUND GUILTY) TO BE TREATED THE SAME AS CONVICTED AND SENTENCED PRISONERS ARE
TREATED UNDER THE SAME ATMOSPHERE, ENVIRONMENT, AND CONDITIONS BY THE SAME
RULES, REGULATIONS, POLICIES, CUSTOMS, PRACTICES, AND PROCEDURES.

1992 - (7 YEARS LATER) THE FEDERAL GOVERNMENT WAS NOTIFIED THAT THE STATE OF
CALIFORNIA HAD DISCOVERED EVIDENCE THAT PHELPS WAS CLEARLY INNOCENT OF THE 1985
CRIMES AND THAT HIS 'DELUSIONAL' CLAIMS OF BEING FRAMED INTO PRISON BY A
INTERNATIONAL JEW CONSPIRACY WAS ACTUALLY TRUE. THE GOVERNMENT ADMITTED (IN
OPEN COURT) THAT PHELPS: (1) DID NOT COMMIT A CRIME, (2) DID NOT VIOLATE ANY LAWS,
(3) DID NOT VIOLATE ANY KIND OF PROBATION OR RELEASE CONDITION, (4) DID NOT VIOLATE
ANY KIND OF COURT ORDER, (5) DID NOT CONSPIRE WITH ANYONE TO COMMIT A CRIME, AND
(6) DID NOT ASSOCIATE WITH ANYONE ENGAGED IN CRIMINAL ACTIVITY, BUT STILL
THE GOVERNMENT WOULD NOT RELEASE PHELPS (NOR WAS AN ATTEMPT MADE TO GAIN HIS
RELEASE) SOLELY BECAUSE THE GOVERNMENT OBJECTED TO THE SINCERELY HELD SHARED
CHRISTIAN RELIGIOUS BELIEFS OF PHELPS, AND THE GOVERNMENT OBJECTED TO HIS POLITICAL,
CULTURAL, AND PHILOSOPHICAL VIEWS, BELIEFS, OPINIONS, AND IDEOLOGIES.

1999 – (14 years after the arrest) Phelps' treating psychiatrist (Dr. Jean Wolf) and his treating psychologist (Dr. Mark Hazelrigg) wrote a report to the committing court in San Francisco California and noted to the court that they had seen (and certified) the evidence that Phelps was actually innocent of the 1985 crimes (and could not, therefore, be a substantial risk under the law) and that Phelps had never suffered from a delusion (and could not, therefore, be suffering from a mental disease or defect under the law) and Phelps could not, lawfully, be confined. Even if Phelps had a manageable mental illness, he did not qualify for confinement under the terms of the law. They wrote "Phelps has shown evidence that brings his delusions into serious question ––– " Both the district court and the 9th circuit court refused to address their statements.


2004 – (19 years after arrest) Phelps was transferred from the federal prison at Butner, North Carolina to the federal prison at Devens, Massachusetts. This action follows.

## V

## STATEMENT OF THE FACTS

1. On November 23, 2004 Phelps arrived, in handcuffs, chains, and shackles, at the federal prison at Devens Massachusetts.

2. He was transferred from the federal prison at Butner North Carolina in violation of Rule 23 of the Federal Rules of Appellate Procedures. The transfer was made without proper due process. Neither his treating doctors, nor his treating team members, were consulted prior to the transfer. There was no emergency. Phelps filed three freedom of information request (BOP headquarters, Butner facility, Devens facility)

IN AN ATTEMPT TO DISCLOSE WHY HE WAS TRANSFERRED SINCE HE WAS A UNCONVICTED CIVIL MENTAL PATIENT NOT SUBJECT TO RULES OF A PRISON, KEONE PRELUDED ANY INFORMATION AND DEVEJS RETURNED THE REQUEST AS SIMPLY "REFUSED." (AS OF THIS WRITING, THERE STILL HAS BEEN NO REPLY).

3. PHELPS WAS LOCKED IN A ROOM AT R&D WITH MENTAL PATIENTS WHO WERE CLEARLY PSYCHOTIC AND AGITATED AND CONFRONTATIONAL BUT THE STAFF WAS INDIFFERENT TO THE SITUATION SAYING PROCEDURES HAD TO BE FOLLOWED.

4. PHELPS WAS GIVEN PAPERS TO SIGN AS A FORMALITY, TO RECEIVE MAIL OR MONEY AND TO MAKE TELEPHONE CALLS. PHELPS ASK QUESTIONS BUT NO ANSWERS WERE PROVIDED. "ITS NOT MY JOB TO ANSWER QUESTIONS" SHE SAID.

5. PHELPS WAS INTERVIEWED BY DR. H. HARS WHO COULD NOT REMEMBER THE ANSWERS TO HIS QUESTIONS AND MERELY REVIEWED THE RECORD OF PHELPS TO MAKE A DIAGNOSIS AND A DETERMINATION FOR CLASSIFICATION AND HOUSING ASSIGNMENT. HE "RUBBER STAMPED" THE DIAGNOSIS THE TRIAL DOCTORS HAD MADE IN 1985 AND DID NOT EXERCISE HIS OWN INDEPENDENT PROFESSIONAL JUDGMENT. HE REFUSED TO LISTEN TO ANY EXPLANATION AND CONSIDERED ANY EXPLANATION OF THE RECORD EVIDENCE OF A EXISTING MENTAL ILLNESS.

AT ALL TIMES DURING THE INTERVIEW PHELPS WAS LUCID, RATIONAL, COMMUNICATIVE, COMPLIANT, AND COOPERATIVE.

HARS HAD PHELPS CONFINED ON A LOCKED UNIT AS A IPSO FACTO ROUTINE WITHOUT ANY REGARD FOR THE TRUE CIRCUMSTANCES OR CONDITIONS. "ALL PEOPLE WHO COME THERE FOR MENTAL HEALTH REASONS (EVALUATION OR TREATMENT) GO TO A LOCKED UNIT," HE SAID "AUTOMATICALLY," "EVEN IF THE CIRCUMSTANCES DON'T WARRANT IT." PHELPS ASK. "YES," HE ANSWERED. "WHAT ABOUT

people not assigned to mental health?" Phelps ask. "They go straight to their assigned housing unit, I believe," he responded. "Even inmates who are psychotic?" Phelps ask. "If they're not sent here for mental health reasons, they go to their assigned housing units." "So its the label and not the condition that determines what happens?" Phelps ask. Unno did not respond. "You're going to Unit N-3," he said. "A locked unit. That's procedure here." "Procedure?" Phelps ask. "I work here. I do what they (the BOP) tells me to do."

He noted for the record that Phelps had previously had a heart attack and two strokes, and that Phelps had a spinal injury and some seizures. He noted also that Phelps was an avowed white supremacist. These notations were made for Doven's records.

6. At Unit N-3 Phelps immediately noted that three television sets were playing at full volume (on different channels) and the noise permeated the entire unit (except for the separate isolated staff offices who kept their doors closed to shut out the noise).

The staff were hostile, oppressive, disciplinarians exercising their training in penology but exhibiting no skills in mental health, or in the care and treatment of the mentally ill.

Phelps ask each employee (at different times) if they knew the difference between a unconvicted civil mental patient and a convicted criminal prisoner. He ask if they knew the difference between a patient and a prisoner and the difference between civil and criminal. All knew the difference but resented being questioned and reacted with hostility and verbal abuse and threats. The staff labeled Phelps as a "Troublemaker" because he ask questions about legal matters and the rules.

For example the B.O.P. Rules require officers and staff to wear name

IS A SINGLE CORRECTIONAL OFFICER WITH NO SKILLS, KNOWLEDGE, OR EXPERIENCE IN MENTAL HEALTH OR MEDICAL CONDITIONS. THEY SIT IN THE OFFICE WITH LOCKED DOORS TALKING ON THE PHONE. WHEN THE INMATE KNOCKS ON THE DOOR, FOR SOME REASON, THE INMATE IS IGNORED OR IS TOLD TO COME BACK WHEN THE OFFICER IS NOT BUSY (WHICH IS ALMOST NEVER).

PHELPS KNOCKED ON THE DOOR ONCE TO REPORT A FIGHT IN THE TV ROOM AND THE FEMALE OFFICER SCREAMED "CAN'T YOU SEE I'M BUSY?" (TALKING ON THE PHONE).

INMATES ARE IN MILIEU TREATMENT WITH NO STAFF SUPERVISION. THEY LEAVE THE UNIT TO THE INMATES TO SET UP THEIR OWN SYSTEM JUST AS LONG AS PROPERTY IS NOT DESTROYED AND THE STAFF IS LEFT ALONE. THE STRONG PREY ON THE WEAK AND CONTROL AND DOMINATE THE UNIT. NEGATIVE BEHAVIOR AND CONDUCT IS REINFORCED WITH STAFF INDIFFERENCE. "I DON'T CARE WHAT HAPPENS ON THE UNIT," ONE OFFICER SAID, "AS LONG AS IT DON'T AFFECT ME."

OFFICERS ARE REQUIRED, BY RULES, TO PERFORM CERTAIN DUTIES AND SIGN IN A LEDGER THE DATE AND TIME THESE DUTIES ARE PERFORMED (SANITARY INSPECTION, EQUIPMENT AND SUPPLIES INSPECTION, SAFETY INSPECTION, SEARCHES, ETC) THE LEDGER IS A COMPLETE FABRICATION THE OFFICER LOCKS HIMSELF, OR HERSELF, IN THE OFFICE FOR AT LEAST 7 HOURS OF THE WORKING SHIFT.

11. OFFICE PETRO-CECHINE ASSAULTED PHELPS WHEN PHELPS WAS ORDERED TO PUT HIS RIGHT ARM UP AGAINST THE WALL (BECAUSE OF HIS SPACKLE) FOR A PAT SEARCH. THEN HE MADE A FALSE AND FABRICATED DISCIPLINARY REPORT THAT CAUSED PHELPS TO BE IN DISCIPLINARY SEGREGATION FOR A WEEK (AND PHELPS IS A CIVIL COMMITMENT NOT SUBJECT TO THE RULES OF A PRISON). NURSE BERGERON KNEW PHELPS MEDICAL CONDITIONS BUT WATCHED PETRO-CECHINE ASSAULT PHELPS AND DID NOT SAY ANYTHING OR DO ANYTHING TO INTERVENE. (THE DISCIPLINARY COMMITTEE COULD EASILY SEE THE REPORT WAS FALSE AND DISMISSED THE CHARGES)

12. DR. SCHNEYER MADE A FALSE CHARGE AGAINST PHELPS WHICH WAS DISMISSED AS UNFOUNDED. BUT NOT BEFORE THE STRESS CAUSED PHELPS TO HAVE A HEART ATTACK THAT REQUIRED TREATMENT, (COUNSELOR BERNHART WAS INDIFFERENT TO THE DEFENSE AND BECAME HOSTILE TO PHELPS)

which caused Phelps to seek treatment.

Officer L. Alba filed a false disciplinary action against Phelps which was later dismissed as being unfounded and false, yet again Phelps had to seek medical attention because of the hostile confrontational behavior of Alba and the operations lieutenant (Guerelli - because he refused to identify himself). Medical consulted a doctor prior to the charges to determine if it would be detrimental or beneficial therapeutic. The operations verbally abused, threatened, and aggressively intimidated Phelps "Give my officers any shit and you'll go to the hole - yea cor that" he screamed (the charge was insolence. The control officer announced over the loud speakers that inmates could move from one place to another. Alba was so busy chatting on the phone she didn't hear it. Phelps knocked on the door. Hostility Hostility! Eventually she realized she was wrong which stink Phelps should up to get a pass. "I'm just doing my job" she said angrily "then do your job right" Phelps said. She wrote a disciplinary report on 'insolence.'). The whole incident caused Phelps to get medical treatment for Migraine.

Phelps asked a officer why he was being harassed by the staff. The officer said "for making complaints in court against the B.O.P." "How did you know I made a complaint in court? No one has been served with papers yet."

13.   Phelps wrote a complaint (against several employees) to be filed in court. Because there were several defendants, he needed several copies. He asked K. Leonard to make copies (Rules state copies will be made at 10¢ per page but he would not do it for less than 15¢ because of the extra effort he would have to make). He made the copies but also made extra copies for the defendants and notified them they were being sued before they were officially served. The retaliatory harassment of Phelps began then (at this writing, they still have not been served) additionally, it

TOOK LEONARD OVER A MONTH TO MAKE THE COPIES. WHEN HE READ THE COMPLAINT
AND DISCOVERED HE WAS A NAMED DEFENDANT, HE REFUSED TO MAKE COPIES. EVENTUALLY
SOMEONE ELSE MADE THE COPIES. ACCORDING TO THE RULES IT WAS LEONARD'S JOB TO
MAKE THE COPIES AND LEGAL COPIES MUST BE KEPT CONFIDENTIAL.

A LIEUTENANT (REFUSED TO GIVE HIS NAME) SAID "YOU FILE A COMPLAINT — WE'LL FILE
COMPLAINTS AGAINST YOU." "THAT'S RETALIATION - AND UNLAWFUL" PHELPS SAID. "THAT'S THE
WAY IT WORKS" HE SAID. "DO YOU KNOW I'M A CIVIL COMMITMENT?" "SURE — SO WHAT?"

14. MAIL INTERFERENCE —

PHELPS IS A UNCONVICTED CIVIL MENTAL PATIENT. PRISON RULES (AND THE FEDERAL
REGULATIONS) STATE THAT INMATES IN MAXIMUM SECURITY PRISONS CANNOT SEND OUTGOING
MAIL SEALED. IT MUST BE UNSEALED AND ANY EMPLOYEE CAN READ THE MAIL AT
ANY TIME AS MANY TIMES AS CHOSEN, FOR ANY REASON OR NO REASON AT ALL.

HOWEVER, INMATES IN MEDIUM SECURITY FACILITIES, LOW SECURITY FACILITIES, AND
"CAMP" FACILITIES MAY SEND OUTGOING MAIL SEALED AND UNINSPECTED.

PHELPS IS REQUIRED TO SEND OUTGOING MAIL UNSEALED SO IT CAN BE INSPECTED
AND READ. PHELPS ALLEGES THAT THIS, STANDING ALONE, IS PRIMA FACIE PROOF THAT HE
IS IN A MAXIMUM SECURITY PRISON AND NOT A HOSPITAL. NO COMMON TYPICAL
COMMUNITY PSYCHIATRIC HOSPITAL WOULD HAVE SUCH A RESTRICTION (ALLOWING SUCH AN
INVASION OF PRIVACY) EXCEPT WHEN THERE HAS BEEN AN ABUSE OF U.S. MAIL (THREATENING
LETTERS.)

PHELPS ALLEGES (BEING A UNCONVICTED CIVIL MENTAL PATIENT) HE HAS AT THE
VERY LEAST, THE SAME RIGHT TO SEND HIS MAIL OUT SEALED AS DOES THE MEDIUM,
LOW, AND CAMP INMATES — WHO ARE CONVICTED AND SENTENCED.

BECAUSE LEONARD TOOK SO LONG IN MAKING PHOTOCOPIES, AND CITROYED SO MUCH,
PHELPS DECIDED TO SEND HIS LEGAL PAPERS TO HIS BROTHER TO BE PHOTOCOPIED
(AT 5¢ PER PAGE). HE WOULD GET A MONEY ORDER TO PAY THE SHERIFF AND SEND

EVERYTHING TO THE SHERIFF TO SERVE DEFENDANTS IN PERSON.

RULES REQUIRE PERSONAL LETTERS (TO FAMILY, ETC) TO BE GIVEN TO THE UNIT OFFICER TO BE INSPECTED AND READ, AND THEN SEALED AND SENT TO THE MAIL ROOM FOR MAILING.

THE MAIL ROOM OFFICER RE-OPENED THE SEALED ENVELOPES AND SAW THEY WERE LEGAL PAPERS AND REFUSED TO MAIL THE ENVELOPE BECAUSE IT SHOULD HAVE BEEN PLACED IN THE "LEGAL MAIL" BOX. (ALL MAIL IS COLLECTED BY THE SAME PERSON AT THE SAME TIME (LEGAL AND REGULAR) AND TAKEN TO THE MAILROOM ALTOGETHER.

PHILLIPS ASK "WHAT DOES IT MATTER HOW IT IS MAILED! IT ALL WINDS UP AT THE SAME PLACE AT THE SAME TIME. IF A LEGAL LETTER IS GIVEN TO THE OFFICER INSTEAD OF BEING PUT IN THE LEGAL MAIL BOX - WHY NOT JUST GO AHEAD AND PROCESS IT AS LEGAL MAIL INSTEAD OF RETURNING IT TO THE INMATE - WHICH TAKES 2 WEEKS."
"RULES ARE RULES" THE WARDEN SAID.

HOWEVER, IN THIS CASE, IT WAS CLEAR THE MAIL PHILLIPS SENT TO HIS BROTHER WAS REGULAR (GENERAL) MAIL. ASSOCIATE WARDON SCHULT AGREED AND MAIL ROOM SUPERVISOR GRANNET AGREED - IT IS REGULAR MAIL AND MUST BE GIVEN TO THE UNIT OFFICER - NOT PUT IN THE LEGAL MAIL BOX (IT TOOK 8 DAYS FOR THE MAIL ROOM OFFICER TO RETURN THE REJECTED MAIL TO PHILLIPS).

PHILLIPS RE-MAILED THE ENVELOPE, AS INSTRUCTED BY SCHULT AND GRANET, AND, AGAIN THE SAME MAIL ROOM OFFICER REFUSED TO MAIL THE ITEM FOR THE SAME REASONS. PHILLIPS WROTE WRITTEN REQUEST TO THE WARDEN AND MAILROOM SUPERVISOR. "INSTRUCT YOUR SUBORDINATES THAT IT IS NOT THE CONTENT OF THE ENVELOPE OF OUTGOING MAIL THAT DETERMINES IF IT IS LEGAL, SPECIAL, OR REGULAR MAIL - IT IS TO WHOM THE ENVELOPE IS ADDRESSED THAT DETERMINES ITS CLASSIFICATION." THEY ALL AGREED AND SAID THEY WOULD CORRECT THE OFFICER.

THEN A LIEUTENANT CONFRONTED PHILLIPS ABOUT THE MAIL AND ACCUSED PHILLIPS OF MAKING COMPLAINTS AGAINST HIS OFFICER AND THREATENED PHILLIPS.

once again he had to be treated for anemia. — From Phelps sent papers to his brother by Certified Mail/Return Receipt. The next day he received a postmarked confirmation of mailing, from the mail room indicating the mail had been sent and was weighed in 2 20 ounces. It was a lie. The weight is fraudulent. Eight days later Correction Bearlda brought this item to Phelps "the Anxious, refused to mail this", it weighs a lb to 20 z — I just questioned why — but she did." He took the envelope with him saying he would mail it. As of this writing it has not been mailed. This delay has cost Phelps to miss a court date, he wrote the San Francisco Court indicating of that the staff was refusing to send out my mail. — Phelps made another complaint to the same people and was assigned the officer who he described, he was out. Phelps mailed out another envelope to his brother. As of this writing (one week later) Phelps has not received confirmation of the mailing and his brother has stated he has not received the envelope. — Phelps asked the night officer about it (the mail is collected at 3 am). "Look," he said "I inspected it and sealed it and gave it to him. Why he didn't mail it, I don't know. Seems like he this it in Polygic, Take it to someone higher up."

In addition the same correspondence rule requires a locked drop box on each unit for outgoing mail. There is none. The rule requires the warden to supply the inmates with free envelopes and writing tablets. He does not. There is nothing free at Devens.

15    The Rules require a free comb to comb the hair. There is no free comb. And a small comb cannot be bought in the commissary. The inmate must purchase a brush/comb combination to get a comb - except for black inmates. Black inmates may purchase a comb separately.

16. OPEN HOUSE — FREE ACCESS.

B.O.P. Rules require staff to have "open house" hours from 9:30-10:30 am and from 1:30 - 2:30 PM daily - Monday through Friday so the inmates will have access to the staff and will be given the opportunity to resolve problems, voice complaints, etc. This rule includes Psychiatrists and psychologist (the rule is not followed). In addition, supervisory staff of every department (including medical health) must be in the inmates dining room at the noon meal so the inmates

can communicate with supervisors. This rule includes medical and mental health. At Devens Prison, no psychiatrist or psychologist has open office hours. In fact, it is rare that a inmate can find his own assigned psychiatrist. They are NEVER in the dining room during the noon meals. NEVER! For a inmate to gain access to his own psychiatrist (even in an emotional crisis) he must submit a written request to the unit officer (it will go out as regular mail at 3 am.). It will go to the mail room. The mail room will send it to the mental health department. The department will send it to the secretary, the secretary will put it in the doctors in box. Maybe — just maybe — a week later the inmate might see his own doctor.

(At any other BOP facility the rule is "catch me when you can.") Then — the doctor may want to put the inmate on call out — which takes another two days.

One day Phelps walked from his unit into the adjacent hallway where the doctors offices are located. Since no names are on (or near) any desks Phelps looked (in passing) in the corner of each office trying to locate the office of Dr. Haas (he had not seen the doctor in over two months). "You can't be in this hallway" the secretary shouted. "Why not?" Phelps asks, "There's no sign saying 'stay out' or anything else." "This is restricted - you have to be escorted to get here." "Well show it" Phelps said. "The escort entry area is in the next hallway." The secretary yelled "This is my hallway — Get out." (Phelps left)

**6.** Phelps put a memo under the door of Dr. Haas requesting to be moved from the double room (444) to the single room (425).

Normally, it is the counselors job to change rooms. Phelps went to counselor Benulla (who is very hostile toward Phelps for making a complaint in court). Phelps waited in line. Two inmates in front of Phelps ask for a room change and Benulla accommodates them immediately. When Phelps ask for a room change, Benulla said "I don't make room changes - see your doctor."

Phelps stood in surprise, "What room do you want?" Benucci ask. "429" Phelps said, "is a single room and I ask before for a single room. Now 429 is vacant." "See your Doctor," he said curtly.

Dr. Hnas responded to the memo 4 days later - "I read this - thank you - everyone knows your preference for a single room." Nothing else.

On the day Phelps talked to Benucci, just two hours after Phelps talked to Benucci, Benucci transferred a inmate into room 429. "When did you ask for this room," Phelps ask the inmate. "I didn't" he said, "The counselor came in a while ago and ask me if I wanted a single room and I said 'Here yes'. Here I am."

18  **Phone Calls:**

Phone calls to anyone on the inmate phone system is monitored and recorded. Regardless if it is to the attorney or anyone. This applies to uncommitted civil mental patients.

If a inmate wants to make a private (unmonitored) call to his attorney, he must do so through the counselor.

The problem is this: "unmonitored" is not unmonitored. First, the counselor calls the attorney to ask if it is O.K. to talk to him. If the attorney says 'yes', the counselor hands the phone to the inmate and then listens to what the inmate tells his attorney. This is what the BOP considers 'unmonitored.' On occasion, the counselor requires the inmate to use the speaker phone so he can hear both sides of the conversation. His justification? --- "Cit - I have to know when they hang up."

(The inmate telephone system can be easily programmed to exclude certain numbers from being monitored or recorded. The county jail had such a system. When Phelps called his brother, it was recorded. When he called his attorney, the computer acted automatically to switch the call to a clear telephone line.)

Phelps is entitled to complete privacy in mail and phone calls because he is a civil patient.

9. When Phelps arrived at Devens Prison he was interviewed by Dr. Haas. Haas noted that Phelps was a racist white supremacist who had a intense animosity toward Jews and non whites. He also noted that Phelps was extremely solitary and did not interact with anyone except B.O.P. Professionals. Phelps informed Haas that in the past, there was always an uncomfortable confrontation with blacks and his own roommates. Even though a roommate might hold the same views, or be the same race, they were never strong racists. They always allowed non whites to visit in the room which Phelps was at the library and the non whites could steal Phelps property and the roommate, being weak, would not stop it. Phelps would then not only have to teach the roommate a lesson but would have to retrieve his property. In addition, Phelps informed the doctor that extreme noise drives him crazy, it makes him very angry. In the past this always led to a confrontation.

But since his heart attack, some things changed. His racist beliefs did not change because they are shared religious and cultural beliefs. What changed was his ability to take action. Before he would just bust heads and make things right but now, stress causes him angina. Confrontation with a roommate, or anyone, could kill him.

18 USC 4351 and 18 USC 4247(e) not only requires a treatment to be individualized but also specific to Phelps' character (and the nature of the crime).

Phelps ask for three things: (1) a single room, (2) to be as far away as possible from any television or electronic entertainment system, and (3) to be around those of his own race. Phelps told the doctors that he did not want to hurt anyone and he did not want to get hurt. "I know what I need" he said, "if you don't give me what I need, someone will just wind up getting hurt."

In the past 20 years Phelps has never proselytized his beliefs. If someone ask, he would teach, but not unless they ask first. Yet he lived his beliefs. He did not talk to blacks, listen to blacks, walk, stand, or sit with blacks. If he

is sitting in the dining room and a Black sits at the table, Phelps quietly moves to another table. If he is standing in line and a Black stands next to him, he will move up or back in line where white inmates are and stand with them. If a Black asks a question, Phelps will ignore him.

Within one week, Blacks known not to sit at the same table as Phelps and search for another table. (There are always snide remarks.)

It is well established that it is counter therapeutic to put Phelps with a roommate, or to mix him with Blacks, or to put him near television sets but what does Dr. Hams do given the moved Phelps from N-3 (closed unit) to a open unit?

He moved Phelps on a predominately Black unit (N-4) (N-5 is mostly white), into a double occupancy room, next to a television room specifically set aside for Blacks. Why would a doctor act so counter therapeutic and deviate so dramatically from the standards of his profession? Because the crime for which Phelps was charged involved Jews and Dr. Hams is a Jew? Because the administration wants Dr. Hams to continue the harassment? For the convenience of the staff?

26. The education staff member told Phelps "we can't provide what is required by law (is on 42:47[c]) because of all the illegal aliens coming into the country through Mexico. We're on a fixed budget and our budget was cut to the bone. Now we have to print everything in two or more languages, that cost twice as much. We have to hire staff to teach them English. We have to hire people to teach the staff a foreign language. They have diseases that America cured decades ago and they have diseases we never heard of. We have to spend money on that. Illegal aliens are draining all our financial resources. Where do we get this money to take care of them when we have only a fixed amount? From you, we have to take money we should be using for you to give to them. You don't get what's coming to you."

because of the medical abuse, there's nothing I can do. I have to do what I have to do on the budget they give me."

"Why is the food rations cut and the food slop food?" Phelps ask the food service staff. "Look around" he said, "look at how many people have flooded the system. This facility is way overpopulated - like all Bureau prisons, once 'illegals' use to be everyone spoke English, now I walk around the place (inmate dining room) and all I hear is foreign language. I ask them a question and they just look at me stupid. They don't even understand my question. We have to feed these people what", when you cut a budget, what do you do? ask a wife or mother what she does. thats what we do. if it wasn't for these illegals, you guys would be better off."

"Why did you come to this country illegally?" Phelps ask a (I) detainee. "You knew you would be arrested, why?" "Cause American prison life is better than open life in Mexico. Here I eat three meals, watch videos, play games, + got a good bed - hey man - this is life," he said, "what about women - a wife - a girl friend?" "Hey man - I wasn't getting nothing back there, what did I lose? I got more here in this prison than I had there, Ya know what I'm gonna do when they deport me? I'm coming back, I go to a mexican neighborhood... mostly show me, if they do - so what. I come here and life good." "But you took away from me when you were there." "So what man - you got plenty." "What about family" "Hey man - I call my family in Columbia once a week, I see the occasional - I got it made life and all."

VI

PRAYER

Phelps prays for Declaratory Judgment and any other Relief and Remedy this court deems fair, just, and appropriate.

Date: 2-22-05

Coy Phelps in Pro Se

Coy Phelps 18872-011
FMC - Devens
P.O. Box 879
Ayer, MA 01432